Rachel LEATHERMAN, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2008–CA–000849–MR.

Court of Appeals of Kentucky.

Jan. 21, 2011.

Rehearing Denied April 12, 2011.

Discretionary Review Denied by Supreme Court Feb. 15, 2012.

Julia K. Pearson, Frankfort, KY, for appellant.

Jack Conway, Attorney General of Kentucky, Gregory C. Fuchs, Assistant Attorney General, Frankfort, KY, for appellee.

Before TAYLOR, Chief Judge; LAMBERT, Judge; HENRY,[1] Senior Judge.

## OPINION

LAMBERT, Judge:

Rachel Leatherman directly appeals from the judgment of the McCracken Circuit Court following a jury trial convicting her of possession of a controlled substance (cocaine), tampering with physical evidence, and operating a motor vehicle under the influence of alcohol or drugs. As a result of those convictions, the trial court sentenced Leatherman to a total of eight years' imprisonment. On appeal, Leatherman challenges the trial court's failure to suppress evidence obtained in conjunction with the investigatory stop and her subsequent arrest, the trial court's granting of the Commonwealth's motion in limine that prohibited her from mentioning her statement to Deputy McGuire, and the trial court's failure to grant a directed verdict on the DUI charge. Having thoroughly reviewed the record on appeal and the parties' briefs, we affirm the judgment of conviction.

The facts leading up to Leatherman's arrest and subsequent conviction are as follows: On June 28, 2006, Vernon Wilkey made an emergency 911 call to report events in his neighborhood on Queensway Drive. The record contains an unofficial transcript of his 911 call:

DISPATCHER: Central dispatch. This is Lou. Could I help you.

MR. WILKEY: Yes, sir. This is Vernon Wilkey. I live out here on Queensway Drive.

And there is a lady in a dark blue looks like a Buick LeSabre. I'd say it's a late '80s, early '90s model. And I've got a license plate number. But she's out here walking around in my neighbor's yard and everything and writing stuff down, and she'd talked to him and mentioned something about tar heroin and all that stuff.

DISPATCHER: Talked to who?

MR. WILKEY: My neighbor next door.

DISPATCHER: And was talking to him about heroin?

MR. WILKEY: Yeah, tar heroin.

\*    \*    \*

DISPATCHER: .... Okay. Do you know what she was writing down?

MR. WILKEY: No.

DISPATCHER: What address on Queensway Drive was she last seen at?

MR. WILKEY: She was just here at mine a few minutes ago at 4015.

DISPATCHER: Is she white or black?

MR. WILKEY: She's white.

DISPATCHER: Hold on just a moment, please.

\*    \*    \*

DISPATCHER: What's the license plate number on that vehicle, sir?

MR. WILKEY: [License number omitted.]

\*    \*    \*

DISPATCHER: What state is that?

MR. WILKEY: Seattle, Washington.

---

1. Senior Judge Michael L. Henry concurred in this opinion prior to the expiration of his term of senior judge service. Release of the opinion was delayed by administrative handling.

She said something about her and her husband staying in a motel and everything.

\* \* \*

DISPATCHER: All right. Officers are already on the way. They'll be out there to speak with you shortly.

If she leaves before they get out there to check the area, could you give us a call back and let us know which way she goes?

MR. WILKEY: Okay.

The following day, Mr. Wilkey completed a written statement detailing what had happened:

On 6–28–2006 a Lady driven a Buick Lasaber stoped at my driveway and ask me if I would sell 2 berrlles and i said they belong to my Naber. She had her paints unbuttoned & unzipped. She acked like she was under the Influence of something. She was a dirty Blound wereing Blue shirt & Blue Jeans. [Spelling and grammatical errors in original.]

The record also includes an unofficial transcript of the dispatch tape, which reads in pertinent part as follows:

DIS: 47. 38. Suspicious person complaint, the 4000 block off of Queensway Drive off of Lesser Harris and Bottom Street. A white female in a dark blue LeSabre that's out walking around asking people about 218A.[2]

\* \* \*

DIS: 38 and 47, that dark blue LeSabre's going to have a Washington tag. [License number omitted.] They don't know who she is, but they're going to call us back if the vehicle leaves before you arrive.

Deputy Eddie McGuire of the McCracken County Sheriff's Department responded to the call and proceeded to the Queensway Drive area. The subject of the complaint was no longer in the area, but on his way back into town, Deputy McGuire came upon a blue Buick LeSabre with Washington license plates in the right lane with the left blinker flashing. The dispatch transcript reflects: "I just passed her. Going to try to find her. See if she'll pass me again. I think she's gonna turn off now. Coming up on Cairo and 60." When Deputy McGuire pulled his cruiser behind the LeSabre, the driver turned on the right turn signal and pulled off to the right side of the road. Deputy McGuire then turned on his lights and pulled up behind the LeSabre. We note that the record contains a videotape of the cruiser cam video; unfortunately, there is no audio recording attached to the video.

Deputy McGuire approached the driver's side of the stopped vehicle and had the driver step out. The driver was Rachel Leatherman, and a records check showed that there were no active warrants for her arrest. Deputy McGuire noticed that Leatherman had glassy eyes, that her pants were unbuttoned and unzipped, and that a pant leg was rolled up. He also noticed that she was nervous and fidgety. Deputy McGuire then performed field sobriety tests. On the horizontal gaze nystagmus (HGN) test, Leatherman showed six clues that indicated impairment. A breath test and later blood tests revealed that there were no drugs or alcohol in Leatherman's system.

When Deputy McGuire asked her about the 911 call, Leatherman referred to Mr. Wilkey as a snitch. She admitted to having been in the Queensway Drive area and

---

**2.** We assume "218A" refers to Kentucky Revised Statutes (KRS) Chapter 218A, which addresses controlled substances.

to asking a man about some barrels. She also stated that she was on several prescription medications, including Adderall, Metoprolol, and Clonazepam. By this time a second deputy, Deputy Jason Walters, had arrived. Leatherman consented to a search of her car, during which they found a bottle of prescription medication, a full cup of beer in the console, and a recorked bottle of wine on the floor of the passenger side. They did not find any illegal drugs during the search.

Deputy McGuire requested that a female officer respond to the scene to perform a search of Leatherman. Paducah Police Officer Gretchen Dawes responded, obtained consent to search, and performed a thorough search of Leatherman, including the front and back pockets of her jeans, the rolled up pants legs, and under her T-shirt. The search is depicted in the cruiser cam video. Officer Dawes did not find any weapons or illegal drugs on her person. Following this search, Deputy McGuire arrested Leatherman for DUI, handcuffed her, and placed her in the back seat of his cruiser. The three officers then performed another search of her vehicle, including the trunk. Again, no illegal drugs were found.

Once the search was concluded, Deputy McGuire drove Leatherman to Lourdes Hospital where blood was drawn for a blood test. When Deputy McGuire removed her from the cruiser at the hospital, Leatherman claims that she stated she had dropped her watch in the back seat. During this period, Deputy McGuire claims to have noticed a small baggie containing what was later confirmed to be crack cocaine in the seatbelt crack in the vicinity of Leatherman's watch. When confronted with this, Leatherman denied that the drugs were hers.

Based on the above, the McCracken County grand jury indicted Leatherman for possession of a controlled substance (cocaine) (KRS 218A.1415), tampering with physical evidence (KRS 524.100) by concealing the baggie of crack cocaine, and operating a motor vehicle under the influence of drugs (KRS 189A.010). Leatherman moved to suppress the evidence discovered as a result of her stop and arrest, arguing that the stop was based on an uncorroborated tip and that there was no probable cause to justify the arrest. Following a suppression hearing, the trial court denied the motion to suppress. It went on to deny subsequent motions to reconsider that ruling, although it did enter a substitute order. The matter proceeded to trial, after which the jury found Leatherman guilty as charged in the indictment. Following the penalty phase and in accordance with the jury's recommendation, the trial court sentenced Leatherman to two consecutive four-year terms of imprisonment for the possession and tampering convictions as well as to forty-eight hours in jail and a $200.00 fine for the DUI conviction. This appeal follows.

On appeal, Leatherman raises three issues. First, she argues that the trial court erred in denying her motion to suppress. Second, she argues that the trial court improperly granted the Commonwealth's motion in limine regarding her statements to Deputy McGuire about her watch. Third, she argues that the trial court should have granted her motion for a directed verdict on the DUI charge. We shall address each of these arguments in turn.

The first issue we shall address is whether the trial court properly denied Leatherman's motion to suppress. The trial court entered two orders addressing this issue, which we shall set forth in full below.

On January 18, 2008, just prior to the trial in the matter, the trial court entered a substitute order denying Leatherman's motion to suppress:[3]

This matter is before the Court on Defendant's motion, through counsel, to supplement the record and to reconsider and set aside an order denying his [sic] motion to suppress evidence. The record is ORDERED supplemented with a 911 transcript. The Court now sets aside its prior order denying Defendant's motion to suppress and substitutes this order denying the motion to suppress.

### FINDINGS OF FACT

1. Police dispatch received a telephone call from a person who gave his name and address, stating that a white female in a vehicle that looked like a late 80's or early 90's dark blue Buick LaSabre [sic], bearing Seattle Washington license plate number ... was "... walking around in [his] neighbors yard and everything and writing stuff down, and she'd talked to him and mentioned something about tar heroin and all that stuff."

2. A Sheriff's deputy testified that dispatch radioed the incident and stated that the white female was attempting to buy heroin.

3. The deputy observed a dark blue LaSabre [sic] with the ... Washington plate, driven by a white female in a right hand traffic lane with her left turn signal activated. The vehicle did not turn but pulled to the right side of the roadway and stopped.

4. The deputy pulled in behind the stopped vehicle and activated his emergency lights.

5. When the deputy went to the vehicle he observed the Defendant with her pants unzipped and unbuttoned. The deputy observed in plain view an open container of what he suspected to be beer and an opened but corked bottle of wine in the car.

6. Defendant failed all six clues of a horizontal gaze nystagmus test, had very glassy eyes, and appeared nervous. When the deputy asked her if she was taking any medication that would explain her condition she stated that she was on several medications, including Clonazepam.

7. The maker of Clonazepam warns that it should not be used when driving a vehicle and that the drug causes abnormal eye movements.

8. The deputy arrested Defendant for operating a motor vehicle under the influence of drugs or alcohol and placed her in the back seat of his patrol car, which he had searched and found clean of any drugs or other items.

9. When Defendant later exited the patrol car the officer searched the back seat and found a piece of cellophane which appeared to contain a controlled substance. The cellophane was located behind the back seat adjacent to what Defendant identified as her wristwatch.

10. The suspected controlled substance lab tested as cocaine.

### CONCLUSIONS OF LAW

1. The deputy did not conduct a stop of Defendant's vehicle. Defendant pulled off the roadway and stopped. The deputy then pulled in behind her

---

**3.** The original order denying Leatherman's motion to suppress had been entered on January 11, 2007.

and activated his emergency lights so as to investigate.

2. The combination of a report of an unknown person, driving a Washington state licensed vehicle in a Paducah, Kentucky residential area, asking about tar heroin, later observed to signal a left turn but pull off the roadway to the right, constitutes reasonable suspicion to investigate and possibly cite for improper signal.

3. A report of suspicious activity by a person who identifies himself by name, telephone number, and address, is presumptively reliable.

4. Defendant's inquiring about heroin, failing a HGN test, signaling a left turn and pulling off the road to the right, and stating that she was taking medication that would cause her to fail the test, constitutes probable cause to arrest for DUI.

5. A police officer may legally search the back seat of his patrol car where the defendant was placed incident to arrest.

6. The results of the search and the plain view discovery of the wine and suspected beer is admissible as evidence at trial.

IT IS HEREBY ORDERED that Defendant's motion to suppress is DENIED.

On January 28, 2008, following the trial, the court entered a supplemental order denying the motion to suppress:

The defendant has requested the court to consider additional information and evidence supplementing the record in this case, based upon which the Court makes the following supplemental Findings of Fact and Conclusions of Law in denying defendant's Motion to Suppress:

## FINDINGS OF FACT

1. The 911 dispatcher received a call from an identified public citizen, Vernon Wilkey, who reported that a white female driving a dark blue LaSabre [sic] with Washington State license plates made unusual and disturbing statements about heroin in his neighborhood.

2. 911 called deputies and alerted them to the woman, her vehicle, and her suspicious drug activity.

3. Within minutes Deputy McGuire observed a dark blue LaSabre [sic] with Washington State license plates driven by a white female exactly matching the 911 description. The vehicle was traveling slowly in the right traffic lane of Highway 60 with the left turn signal activated for an unusually long time for no apparent reason. The vehicle did not turn left, but continued on straight, which all appeared unusual and suspicious to the deputy.

4. The vehicle then pulled to the right side of the road and stopped without any signaling to do so by the deputy. This demonstrated additional unusual behavior by the defendant. The deputy then pulled in behind the defendant's vehicle and activated his roadside stop lights. By the time the deputy stopped, he had reasonable grounds and reasonable suspicion to approach the driver. He exited his cruiser and walked to speak to the driver.

5. The deputy observed in plain view a half empty but opened container of beer and a half empty but corked bottle of wine. The defendant's eyes were glassy. He then had reasonable grounds to check the driver's sobriety. The defendant failed all HGN tests. She also gave unusual responses to instructions given to her by the deputy, she appeared somewhat confused; she appeared nervous; and she appeared to the deputy to be under the influence of drugs or alcohol.

6. The defendant admitted to the deputy that she was on a number of medications, including Clonazepam. Clonazepam is a strong anti-psychotic medication which interferes with motor performance, including driving a motor vehicle. Clonazepam also causes abnormal eye movements.

7. The deputy had reasonable grounds and probable cause to arrest the defendant for DUI.

8. The defendant was transported to the hospital for the taking of a blood test. At the hospital a suspicious baggie was found next to the defendant's watch in the back seat of the deputy's patrol cruiser. The deputy knew that the patrol cruiser did not have the suspicious plastic baggie or a watch before the defendant was placed into the back seat. The defendant admitted losing her watch. The deputy had probable cause and exigent reasons to seize the baggie. The baggie appeared to contain crack cocaine. The deputy had probable cause to arrest the defendant for tampering with evidence and possession of cocaine.

### CONCLUSIONS OF LAW

1. The caller who reported the defendant's unusual interest in heroin was identified. Such a report is considered more reliable than an anonymous tip.

2. The deputy had reasonable suspicion and probable cause to make an investigation stop and search of the defendant and her vehicle.

3. Discovery of the suspicious plastic baggie in the back seat of the deputy's cruiser was based on plain view discovery. The defendant and her vehicle had previously been properly detained based on the circumstances above which proceeded [sic] the discovery of the baggie.

■ Our standard of review from a denial of a motion to suppress is twofold. First, we must determine whether the findings of fact are supported by substantial evidence. If so, those findings are conclusive. Kentucky Rules of Criminal Procedure (RCr) 9.78; *Adcock v. Commonwealth*, 967 S.W.2d 6, 8 (Ky.1998). If not, the factual findings must be overturned as clearly erroneous. *Farmer v. Commonwealth*, 169 S.W.3d 50, 53 (Ky. App.2005). Second, we must perform a *de novo* review of those factual findings to determine whether the lower court's decision is correct as a matter of law. *Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996); *Commonwealth v. Banks*, 68 S.W.3d 347, 349 (Ky.2001); *Garcia v. Commonwealth*, 185 S.W.3d 658, 661 (Ky.App.2006); *Stewart v. Commonwealth*, 44 S.W.3d 376, 380 (Ky.App.2000).

Leatherman has not contested the trial court's factual findings in its orders denying her motion to suppress. Rather, she has contested the trial court's conclusions of law based upon those findings.

■ Our first consideration is whether Deputy McGuire had sufficient reason to stop and investigate Leatherman's automobile. We hold that Deputy McGuire had sufficient grounds to stop Leatherman and investigate the situation, as well as probable cause to arrest her.

In *Taylor v. Commonwealth*, 987 S.W.2d 302, 305 (Ky.1998), the Supreme Court of Kentucky addressed the investigatory stop of automobiles and held:

In order to justify an investigatory stop of an automobile, the police must have a reasonable articulable suspicion that the persons in the vehicle are, or are about to become involved in criminal activity. *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Commonwealth v. Hagan*, Ky., 464 S.W.2d 261 (1971). In order to determine whether there was a reasonable

articulable suspicion, the reviewing appellate court must weigh the totality of the circumstances. *See Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

More recently, in *Johnson v. Commonwealth,* 179 S.W.3d 882, 884 (Ky.App.2005), this Court addressed the same issue, setting forth the applicable law as follows:

> It is well settled that an investigative stop of an automobile is constitutional as long as law enforcement officials have a reasonable suspicion—supported by specific and articulable facts—that the occupant of the vehicle has committed, is committing, or is about to commit an offense. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Collins v. Commonwealth,* 142 S.W.3d 113 (Ky.2004). In addition to the requirement that the stop be justified at its inception, the police officer's subsequent actions must be reasonably related in scope to the circumstances that gave credence to the initial stop. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229, 238 (1983).

Reasonableness "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996).

Based upon the prior 911 call, during which the caller described a woman driving a car that displayed Washington state license plates who was committing criminal activity, and the undisputed fact that Leatherman pulled to the side of the road and stopped before Deputy McGuire activated his emergency lights, we hold that

there was no constitutional violation in the investigatory stop. However, the law is clear that a stop may only continue long enough for the officer to determine whether his suspicions were correct.

On this issue, the United States Supreme Court has held:

> The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: *an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.* Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

*Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (internal citations omitted, emphasis added).

Here, Deputy McGuire noted that Leatherman exhibited glassy eyes and that she was acting nervous and fidgety. He also noted that she had a cup of beer and an opened, but recorked, bottle of wine in the vehicle. That certainly provided Deputy McGuire with grounds to determine whether Leatherman was driving under the influence by performing field sobriety tests. Leatherman then demonstrated six

clues on the HGN test.[4] Accordingly, because of the open containers of alcohol and the results of the HGN test, the deputies were justified in performing a breathalyzer test to determine whether Leatherman was under the influence of alcohol. We note for the record that the test was negative and that later blood tests were also negative for alcohol or drugs. Finally, consent searches of her automobile and her person did not reveal any heroin or any other illegal substance. However, there is no dispute that the deputies discovered a bottle of prescription medication, and Leatherman admitted that she was on several medications, including Clonazepam, which did constitute sufficient grounds for her continued detention. Our conclusion is supported by this admission, as well as Deputy McGuire's testimony related to his observations of Leatherman.

▇ We must next consider whether Deputy McGuire had the requisite probable cause to arrest Leatherman without a warrant.

KRS 431.005(1) permits a peace officer, including a sheriff's deputy, to make an arrest in the following situations:

(a) In obedience to a warrant; or

(b) Without a warrant when a felony is committed in his presence; or

(c) Without a warrant when he has probable cause to believe that the per-

son being arrested has committed a felony; or

(d) Without a warrant when a misdemeanor, as defined in KRS 431.060, has been committed in his presence; or

(e) Without a warrant when a violation of KRS 189.290, 189.393, 189.520, 189.580, 511.080, or 525.070 has been committed in his presence, except that a violation of KRS 189A.010 or KRS 281A.210 need not be committed in his presence in order to make an arrest without a warrant if the officer has probable cause to believe that the person has violated KRS 189A.010 or KRS 281A.210.

There is no dispute that Deputy McGuire did not have a warrant for Leatherman's arrest. Therefore, his authority to arrest Leatherman would fall under subsection (e).

In *Maryland v. Pringle*, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), the United States Supreme Court addressed warrantless arrests and the concept of probable cause. The Court recognized as a general matter that, "[a] warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause[,]" *id.*, 540 U.S. at 370, 124 S.Ct. at 799, and then addressed the question as to "whether the officer had probable cause to believe that

---

4. "Nystagmus is an involuntary rapid movement of the eyeball, which may be horizontal, vertical, or rotatory. (The Sloane–Dorland Ann. Medical–Legal Dict. (1987) p. 504.) An inability of the eyes to maintain visual fixation as they are turned from side to side (in other words, jerking or bouncing) is known as horizontal gaze nystagmus, or HGN." *People v. Ojeda*, 225 Cal.App.3d 404, 406, 275 Cal.Rptr. 472, 472–73 (1990).

The horizontal gaze nystagmus (HGN) test is one of the tests law enforcement officers perform either in the field or at the police station when they suspect an individual is

under the influence of alcohol or some other drug. The prosecution often introduces the results of the HGN test in DWI prosecutions. This test is based on the theory "that alcohol and drug use increases the frequency and amplitude of HGN and cause it to occur at a smaller angle of deviation from forward." Although alcohol and drug use "may increase the HGN, it can also be produced by other pathological, chemical or natural causes." 3 Barbara E. Bergman and Nancy Hollander, Wharton's Criminal Evidence § 13:49 (15th ed.2009).

Pringle committed that crime [possession of cocaine]." *Id.* It went on to provide a comprehensive discussion of the probable-cause standard:

The long-prevailing standard of probable cause protects citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, while giving fair leeway for enforcing the law in the community's protection. On many occasions, we have reiterated that the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.

The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that the substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized.

*Id.,* 540 U.S. at 370–71, 124 S.Ct. at 799–800 (internal citations, quotations, and brackets omitted). Finally, the Court instructed that "[t]o determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Id.,* 540 U.S. at 371, 124 S.Ct. at 800.

Similarly, the Supreme Court of Kentucky has stated:

As the United States Supreme Court has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.

*Williams v. Commonwealth,* 147 S.W.3d 1, 7–8 (Ky.2004).

In the present case, we hold that Deputy McGuire had probable cause to arrest Leatherman for DUI. Deputy McGuire testified that Leatherman appeared to be under the influence of something, despite his observation that she was not driving erratically or weaving. Furthermore, Leatherman failed the HGN test, which reveals intoxication by alcohol or some other drug, although she later passed the breathalyzer test. Finally, the product information for Klonopin (Clonazepam) attached to Leatherman's brief states that patients taking that medication "should be cautioned about operating hazardous machinery, including automobiles, until they are reasonably certain the Klonopin therapy does not affect them adversely." Therefore, the observation of Leatherman's glassy eyes and odd behavior coupled with her admission that she was taking prescription medication that included a warning about driving was sufficient to provide Deputy McGuire with probable cause to arrest her for DUI. Therefore, Deputy McGuire's warrantless arrest of Leatherman did not deprive her of her constitutional rights against illegal search and seizure.

■ Next, we shall address Leatherman's argument that the trial court erred in granting the Commonwealth's motion in limine prohibiting her from mentioning any statement or question she made to

Deputy McGuire regarding her watch in the backseat of the cruiser. Leatherman contends that she should have been permitted to elicit testimony from Deputy McGuire that she had asked him about her watch before he actually discovered it or the drugs in the backseat of the cruiser. Because Deputy McGuire was permitted to testify that Leatherman admitted the watch was hers, she argues that the jury was left with the impression that the drugs were also hers. She goes on to argue that her statement to Deputy McGuire about her watch did not constitute hearsay because it was not offered to prove the truth of the matter asserted in the statement— that she had lost her watch. Rather, it was offered to show the effect it had on Deputy McGuire in that he looked behind the seat to retrieve the watch (where he found the drugs) and to establish his inconsistent statements from earlier proceedings. The Commonwealth, in turn, argues that the trial court did not abuse its discretion in disallowing the introduction of this statement during Deputy McGuire's testimony.

In support of this argument, Leatherman cites to *Schrimsher v. Commonwealth*, 190 S.W.3d 318 (Ky.2006). In *Schrimsher*, the Supreme Court of Kentucky addressed the application of Kentucky Rules of Evidence (KRE) 106, also known as the rule of completeness, which provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Describing the rule, the *Schrimsher* Court held that,

> [A] party purporting to invoke KRE 106 for the admission of otherwise inadmissible hearsay statements may only do so to the extent that an opposing party's introduction of an incomplete out-of-court statement would render the statement misleading or alter its perceived

meaning. The issue is whether the meaning of the included portion is altered by the excluded portion.

*Schrimsher*, 190 S.W.3d at 330–31 (footnote, citation, and internal quotation marks omitted).

Regarding Leatherman's reliance on *Schrimsher*, the Commonwealth argues that she was attempting to explain an earlier statement, not complete an incomplete out-of-court statement to prevent the jury from being misled. The Commonwealth also argues that Leatherman is precluded from raising the issue of the discrepancy in Deputy McGuire's statements during the course of the proceedings because there was no foundation in place that would permit her to impeach his prior statements and because the argument was different from the one presented below, citing *Kennedy v. Commonwealth*, 544 S.W.2d 219, 222 (Ky.1976), *overruled on other grounds by Wilburn v. Commonwealth*, 312 S.W.3d 321 (Ky.2010).

■ Kentucky law is well settled that a trial court's decision to admit evidence is subject to an abuse of discretion standard.

> Since the trial court's unique role as a gatekeeper of evidence requires on-the-spot rulings on the admissibility of evidence, we may reverse a trial court's decision to admit evidence only if that decision represents an abuse of discretion. And for a trial court's decision to be an abuse of discretion, we must find that the decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.

*Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky.2007) (internal quotation marks and footnotes omitted). Similarly, "[a] trial court's ruling under KRE 106 (*i.e.,* the "rule of completeness") is discretionary." *Schrimsher*, 190 S.W.3d 318, 330 (Ky. 2006).

While we disagree with the Commonwealth's "can of worms" argument, we ulti-

mately agree that the trial court did not abuse its discretion in declining to admit this statement during Deputy McGuire's testimony. We note that the trial court indicated that it would permit Leatherman to testify to her statement regarding the watch had she opted to take the stand in her own defense. Furthermore, Leatherman did not attempt to impeach Deputy McGuire's prior statements regarding the discovery of the watch and drugs through laying a proper foundation. Even if we were to hold that this ruling was made in error, we must hold that it constitutes harmless error as the ruling is not "inconsistent with substantial justice." RCr 9.24. Permitting the introduction of this out of court would not have changed the outcome due to the strength of the rest of the testimony that was introduced, including the close proximity of the watch and the drugs as well as the search of the area prior to Leatherman's placement in the cruiser.

■ Furthermore, we perceive no palpable error under RCr 10.26 in the Commonwealth Attorney's statements during closing argument. Leatherman contends that she established palpable error in the Commonwealth Attorney's reference to her watch as an "autograph" on the drugs and as well as in what she describes as an impermissible comment on her silence in the following passage from the trial:

The simple issue under this case is whether a jury is going to hold her accountable or give her a pass for reasons that have not been presented, no justifications, no excuses, no contradictions of the facts and the testimony you heard.

We disagree with Leatherman's assertion that such argument violated her constitutional rights or rose to the level of palpable error justifying any further review.

■ Finally, we shall consider Leatherman's argument that the trial court erred in denying her motion for a directed verdict on the DUI charge. Leatherman contends that the Commonwealth failed to introduce sufficient proof to permit the matter to go to the jury because there was no scientific proof revealing the presence of a prescription medication in her system.

The Supreme Court of Kentucky succinctly set forth the directed verdict rule in *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991):

On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*See also Wilburn v. Commonwealth,* 312 S.W.3d 321 (Ky.2010).

The applicable statute in this case is KRS 189A.010, which addresses the crime of driving under the influence. Specifically related to this case, the Commonwealth was required to prove that Leatherman was operating her motor vehicle "[w]hile under the influence of any other substance or combination of substances which impairs one's driving ability." KRS 189A.010(1)(c). The evidence elicited at trial established that Leatherman admitted to Deputy McGuire that she was taking three prescription medications, including Clonazepam, which contains a warning re-

garding driving while on that medication. Deputy McGuire also testified as to his observations of Leatherman's behavior, including the results of the HGN test showing intoxication. Furthermore, Mr. Wilkey testified at trial that Leatherman and her husband visited him several months after the incident regarding his upcoming testimony. He reported that Leatherman told him that she was unable to remember what they discussed because she was "whacked out." This evidence is more than a mere scintilla and is of sufficient substance to permit the question of guilt to go to the jury. *Commonwealth v. Sawhill,* 660 S.W.2d 3, 5 (Ky.1983).

For the foregoing reasons, the judgment of the McCracken Circuit Court is affirmed.

ALL CONCUR.